IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BOGDAN LIZAK,                               )
                                            )
            *Plaintiff,*                     )
            v.                              )        No. 08-C-1930
                                            )
GREAT MASONRY, INC., and KRZYSZTOF          )        Honorable David H. Coar
MENDYS,                                     )
            *Defendants.*                    )
                                            )
                                            )

**<u>MEMORANDUM OPINION AND ORDER</u>**

On April 8, 2008, Plaintiff Bogdan Lizak's ("Plaintiff") brought this action against

Defendants Great Masonry, Inc. and Krzysztof Mendys, alleging seven counts.  On March 30,

2009, this Court dismissed Count VI.  Plaintiff voluntarily withdrew Counts II and V.  The

instant matter proceeded to bench trial on Counts I, III, IV, and VII:  failure to pay overtime

wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1) (Count I);

retaliatory discharge in violation of the FLSA, 29 U.S.C. § 215(a)(3) (Count III); failure to pay

overtime wages in violation of the Illinois Minimum Wage Law ("IMWL"), § 820 ILCS

105/4a(1) (Count IV); and failure to identify and classify Plaintiff as an employee in violation of

the Illinois Employee Classification Act, § 820 ILCS 185/20 (Count VII).  Defendants failed to

appear at trial, and proceedings concluded after Plaintiff presented his case.  Plaintiff presented a

post-trial memorandum.  Based on the trial, and parties' pre-trial and post-trial submissions, the

Court makes the following findings of fact and conclusions of law.  To the extent that any

1

findings may be deemed conclusions of law, they shall also be considered conclusions; to the

extent that any conclusions may be deemed findings of fact, they shall also be considered

findings. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

**I.      Findings of Fact**

**A.  Parties**

1. Defendant Great Masonry, Inc. ("Great Masonry" or "the Company") is an Illinois
   corporation in the mason contracting business.

2. Great Masonry went into business in 2001.

3. The owners of Great Masonry since its inception are Defendant Krzysztof Mendys
   ("Mendys"), Stefan Szwab, and Eugeniusz Slebarski, who have held an equal ownership
   interest at all times.

4. Great Masonry's primary business involved bricklaying.  Great Masonry utilized
   bricklayers, laborers, operators, drivers, a warehouseman, and crew chiefs or foremen.

5. Plaintiff Bogdan Lizak ("Lizak") began working for Great Masonry in November 2002.

6. Lizak was originally hired as a laborer.

7. In approximately March 2003, after having observed Lizak's work, Mendys offered to
   make Lizak a crew chief and Lizak accepted.

8. Mendys promoted Lizak to become a crew chief because he considered Lizak to be
   particularly intelligent and a particularly capable bricklayer.

9.  Lizak continued to work as a crew chief from the time he was appointed to that position until he was terminated on or around January 10, 2008.

**B.   Great Masonry's Practices**

10. Beginning in or around April 2008, the Company began making several changes to its basic business model.  Unless otherwise stated, the remaining facts refer to the period beginning at least as early as January 2005 and continuing at least through April 2008.

11. Before Great Masonry started operating, Mendys and one of his co-owners, Mr. Slebarski, spoke to Mr. Slebarski's brother who is an accountant.  He explained to them the costs of taking deductions, paying payroll taxes, and paying overtime.

12. When workers were first hired and paid, Mendys explained to the other two owners that Great Masonry could not be launched and survive if it treated its workers as employees rather than independent contractors.  The three owners mutually decided that they would not take deductions, or pay payroll taxes or overtime.

13. With a single exception, Great Masonry has reported its payments to all of its employees, including Lizak, on Form 1099.

14. For each year he worked for the Company, Lizak filed tax returns in which he indicated that he was self-employed, and the Form 1099 the Company issued to him for 2005 to 2007 stated his compensation as $75,662.00, $96,358.00, and $86,194.00 for each respective year.

15. All of Great Masonry's workers, aside from the three owners, were paid at an hourly rate. Great Masonry generally did not pay premium rates for the time worked over forty hours in a week, nor did it withhold amounts from the employees' pay or pay an employer portion toward social security, Medicare, or unemployment compensation. The only exception to this was when Mendys came to believe that workers he had employed were sent by a labor union. Because he believed that these individuals and the union intended to undermine the Company, he arranged for those workers to be compensated in the manner required for employees. The Company thus withheld payment for social security, Medicare, and unemployment compensation. Although Mendys did not believe that any labor union members worked over forty hours per week, any who did so would have been paid at a premium rate for overtime.

16. If Great Masonry's workers made a mistake on the job, the Company would bear the cost of correcting or repairing it.

17. The work week for pay purposes was Sunday through Saturday. Employees were paid every other Friday, six days after the last day of the pay period. The employees reported their hours to the crew leaders who examined them before relaying that information to Mendys. This was done on Wednesday of the week during which the workers were to be paid. Mendys would then prepare the checks and arrange for crew leaders to receive them on the job or at some other location on the day the checks were distributed.

18. Great Masonry alone paid the workers' wages.

19. Mendys's expected that as long as the Company had adequate work, all workers would retain employment unless they wished to leave permanently. Mendys assumed the

workers would be available to work or the Company full-time unless they had an excuse such as illness.  It would not have been acceptable for any of the employees to have announced that they were going to leave and work for somebody else for a few months and then resume employment with the Company.

20. The only pay received by workers was for the hours they worked.

21. When Lizak and the other workers were prevented from working because of weather or another reason, they were not paid.

22. If the workers were forced to halt their work due to rain and waited for the rain to stop in order to resume, they were not paid for their waiting time.

23. Great Masonry never laid off a significant number of employees.  Individual employees were laid off if Mendys disapproved of their work, but works typically finished one project and immediately moved on to the net.  Mendys assumed the people with whom he was satisfied would remain with the Company and move from one project to the next, and as far as he knows the employees expected to have that opportunity.

24. New employees normally came to the Company either through word of month contact with current employees or in response to advertisements Mendys placed in Polish newspapers.  In most instances, the applicant would call Mendys and he would interview him by phone, inquiring particularly about previous work.  If Mendys felt the applicant was suitable, he would assign him to a particular crew based on the staffing needs of each of the crews at the time and the status of the projects they were working on.

25. Either of the co-owners could also hire additional employees.  Lizak never hired anyone without consulting Mendys.

26.  The Company operated with five crews, headed by Szwab, Slebarski, Lizak, Jan Zarzycki and Slawomir Chudacek.

27. Mendys decided which crew would be assigned to a given site, and did so based on the status of completion of the previous assignment.  Although the crews typically worked at separate sites, members of one crew might be transferred to another crew's site if the need arose.  Mendys made all of these decisions.

28. Mendys was responsible for obtaining work and making the financial arrangements with customers, both at the start and during the course of a project.  Although the other two owners also had the authority to negotiate price changes, they delegated this responsibility to Mendys.  The non-owner crew chiefs did not have the authority to negotiate prices with customers.  Mendys had the sole authority to collect payment from customers.

29. The Company had six forklifts, sufficient scaffolding for five crews on five different jobs, 20 to 30 mixers, five trucks, and additional equipment such as wheelbarrows, spades, and basic equipment needed for bricklaying.

30. The Company also purchased mortar, sand, lime, rebar, wires, and a number of minor items.  The workers were not expected to provide these things themselves.

31. Bricklayers were expected to provide their own hand tools.

32. The Company's owners determined the amount of equipment necessary for each project, and they ordered more equipment when required.

33. Mendys inspected each of the jobsites periodically and with equal frequency.

34. If a customer wanted a project to be completed more quickly than anticipated, he or she would make a request to the crew chief, who would then contact Mendys.  Mendys would then decide if another crew should be added.

35. If a customer complained about some aspect of the work, Mendys would decide if the customer received a price reduction.

36. Lizak was initially hired at a rate of $11/hour.  Approximately one month after he began working for the Company, Lizak asked Szwab for a raise.  Szwab said that he needed to ask Mendys.  Two or three days later, Szwab said that Mendys had approved a raise of $1.00/hour.  Lizak regularly asked Mendys to increase his pay and Mendys regularly approved raises of varying amounts.

37. As of April 2005, the Company was paying Lizak $30.00/hour.  Effective September 12, 2005, the Company was paying him $35.00/hour.  Lizak requested a further raise, but Mendys refused because he felt that the business could not afford it and Lizak was already earning the top rate.

38. Lizak did not have a separate business of his own, and the work that he did for the Company was how he earned a living during the period of his employment.  Mendys was aware of this.

### C.  Circumstances of Lizak's Discharge

39. Lizak normally received the paychecks for the men in his crew from Mendys and then distributed them.

40. On January 4, 2008, Lizak and the members of his crew were scheduled to receive their pay for the period of December 17, 2007 to December 29, 2007.  He and the other members of his crew did not receive their checks that day.

41. Lizak asked Szwab, who was present at the jobsite, when he would receive the paychecks.  Szwab said they were to receive them the next day.  He also called Mendys about the checks, but was unable to reach him.

42. On January 5, 2008, Lizak did not receive the checks.  He again questioned Szwab about the paychecks at the jobsite.  Szwab said they were to receive the checks on the following Monday.  He again called Mendys about the checks, but was unable to reach him.

43. On January 7, 2008, Lizak did not receive the checks.  He again questioned Szwab, who said they would be available the next day.  He also called Mendys, but was unable to reach him.

44. On January 8, 2008, Lizak and his crew were unable to work due to low temperatures. Lizak called Szwab that day and again asked him about the checks.  Szwab said he could pick them up at the Company's office that day.  Lizak called the office to see if the checks were ready, but no one answered the phone and there was no way to leave a message.  Lizak called Mendys directly and left him a message regarding the checks.

45.  On January 9, 2009, Lizak questioned Szwab about the checks at the jobsite.  Szwab said

they would receive the checks later that day, but the checks did not arrive.  Szwab then

said that the checks would arrive the next day.  Lizak responded that as a sign of protest,

he would not go to work the next day.  Szwab told him not to incite the other employees.

Lizak also managed to reach Mendys on the telephone and discussed his difficulty in

obtaining the paychecks since the previous Friday.  He also stated that he would not

attend work the next day as a sign of protest.  Mendys told Lizak to do whatever he

deemed reasonable.

46. Lizak did not come to work on January 10, 2008, but the other men in his crew did.  That

morning, Mendys called Lizak and told him that the checks would probably be ready that

afternoon.  Lizak responded that he was not at work because he was protesting.

47. That night, Lizak spoke to Szwab on the telephone.  Lizak asked him why he was asked

to return his time sheet and the construction plans, and if this meant he was fired.  Szwab

said yes and hung up the telephone.  Lizak called Szwab again, and asked if he was fired

because he went on strike.  Szwab said yes.

48. Lizak returned the construction plans and his time card to the Company's office as

requested.  He also received the check that had been due on January 4, 2008, and another

check for his pay from January 4 until the time he was fired.  While at the office, he saw

Mendys and asked if he could come back to work for the Company.  Mendys refused to

discuss this with him.

49. Before the incident on January 10, no one had told Lizak that his job was in jeopardy.

50. After Lizak was fired, he tried to obtain new employment by making phone calls and leaving advertisements in hardware stores.  Although he obtained temporary work on a number of occasions, he was unable to find a job that he felt was a suitable replacement for his position at Great Masonry.

51. In or around April 2008, the Company moved to a different business model.  The most significant change was that the Company began using other business entities to perform the work as subcontractors.  The Company continued to use its existing workforce to complete some of the projects that were already in progress.  For the jobs completed using the Company's own workers, there was no particular change in the way the workers were paid or the business was run.

## II.    Conclusions of Law

### A.  Jurisdiction

This Court has jurisdiction over Counts I and III pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331, and over Counts IV and VII pursuant to 28 U.S.C. § 1367.

### B.  Count I:  failure to pay overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1)

Plaintiff first alleges that Defendants failed to compensate him at a premium rate for his overtime as required by the FLSA.  29 U.S.C. § 207(a)(1).  Defendants contended in their answer to Plaintiff's complaint that Plaintiff does not meet the definition of "employee" under the

FLSA.  Under the FLSA, "employees are those who as a matter of economic reality are dependent on the business to which they render service."  *Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir. 1987).  In order to assess whether a person is an employee, courts look not at "a particular isolated factor[,] but to all the circumstances of the work activity."  *Id.* Courts have identified the following six criteria as relevant to this inquiry:

1)   The nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2)   The alleged employee's opportunity for profit or loss depending upon his managerial skill;

3)   The alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4)   Whether the service rendered requires a special skill;

5)   The degree of permanency and duration of the working relationship;

6)   The extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1534-35.  Finally, each of the criteria "must be applied with [the] ultimate notion in mind" that "dependence…indicates employee status."  *Id.* at 1538.

Under each of the six criteria discussed above, Lizak was clearly an employee for purposes of the FLSA. Mendys had ultimate responsibility and control over the nature in which Plaintiff's work was performed.   Mendys was responsible for deciding how many workers were

assigned to particular projects.  He also decided the amount of material to be used for each

project, and determined whether the work was being completed at an appropriate pace.

Furthermore, he frequently stopped by the project site to inspect the quality of the work being

performed.  Second, Plaintiff had no opportunity for profit or loss depending on his managerial

skill.  Regardless of how the work was performed, Plaintiff was compensated on an hourly basis

and did not receive bonus payments of any sort.  Third, Plaintiff had little investment in

equipment or materials, nor did he have the authority to hire workers.  Plaintiff's sole investment

in equipment consisted of the hand tools he needed for bricklaying.  The Company, on the other

hand, provided forklifts, scaffolding, mixers, trucks, wheelbarrows, spades, mortar, sand, and

other equipment needed for bricklaying.  Furthermore, only the Company's three co-owners had

the authority to hire workers.  Plaintiff had not hired any of the members of his crew.

Additionally, Plaintiff did not have the authority to fire workers.  If a worker failed to report to

work, Plaintiff merely informed Mendys, who then instructed Lizak on the action he was to take.

Fourth, Plaintiff's services did not require any special skill.  Although Plaintiff was promoted

from general laborer to bricklayer, the Company's main business was masonry and Plaintiff's

background was not any more specialized than the other workers typically employed by the

Company.   Fifth, the parties stipulated that Mendys expected the workers to remain with the

Company after individual projects were completed.  Furthermore, Plaintiff worked at the

Company continuously from November 2002 until January 2008.  The duration coupled with the

consistency of his employment indicate that Plaintiff was not an independent contractor.  Finally,

Plaintiff played an integral role in the Company's business by supervising a crew that worked

independently at various job sites.  Plaintiff therefore satisfies every factor relevant to

determining a worker's status as an employee under the FLSA.  Consequently, this Court rejects Defendants' argument that he was an independent contractor.

Under the FLSA, an employer must pay an employee who works more than 40 hours in a week at a rate one and one half times the employee's regular rate for hours worked after the fortieth hour.  29 U.S.C. § 207(a)(1).  The parties stipulated as to the number of hours over forty that Plaintiff worked during each week of his employment for the three years prior to the day he filed his complaint, as well as his rates of pay, and Defendants do not dispute that they failed to pay overtime premiums.  Defendants make no other argument in defense of their conduct.  As a result, this Court finds that their failure to pay overtime wages violated § 207(a)(1).

The statute of limitations for an FLSA claim is two years if the violation was not willful, and three years if it was willful.  *See Howard v. City of Springfield*, 274 F.3d 1141, 1144 (7th Cir.  2001).  Defendants willfully violated the FLSA  because they knew since the time they established the business that the law required them to pay overtime premiums to their employees, but they decided not to do so because they concluded that it was against their economic interest.  Furthermore, Mendys admitted in his deposition testimony that the Company treated individuals whom they suspected were sent by the labor union as employees under the FLSA because it was wary of potential legal claims.  Because there was no difference in the work performed by those individuals and the other workers, the Company had to have realized that its obligations under the FLSA extended to all of its workers.  Therefore, the applicable statute of limitations is three years, and Plaintiff may only seek recovery for the pay period ending April 9, 2005, until his employment was terminated on January 10, 2008.

The FLSA requires that employees be compensated at a rate of one and a half times the employee's regular rate for hours worked over forty per week.  29 U.S.C. § 207(a)(1).  Based on the figures stipulated by the parties, Plaintiff is entitled to an award of $28,846.25 for his unpaid overtime premiums during the actionable period of his employment.

The next consideration is whether Mendys is personally liable for this violation.  Defendants disputed in their answer that Mendys was an "employer" within the meaning of the FLSA.  Under the FLSA, "' [e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee…" 29 U.S.C. § 203(d).  Mendys fits this description, as he acted on behalf of Great Masonry in all of his dealings with Plaintiff.  An individual "can be considered the employer referenced in the [FLSA] only if:  (1) he had supervisory authority over the plaintiff; and (2) he was at least partially responsible for the alleged violation."  *Wilson v. Advocate Health and Hospitals Corp.,* No. 05-C-6408, 2006 U.S. Dist. LEXIS 45283, at *7 (N.D. Ill. June 21, 2006) (citing *Riordan v. Kempiners,* 831 F.2d 690, 694 (7th Cir. 1987)).  As already stated, Mendys directly supervised Plaintiff's work.  Furthermore, he was partially responsible for the Company's failure to pay overtime premiums because he, in concert with the other owners, made the decision not to pay overtime and he had sole authority over the Company's finances and distribution of wages.  An individual with sufficient control over a business and a particular set of FLSA violations can be personally liable as an employer for those violations.  *Morgan v. Speak Easy, LLC,* No. 05-C-5795, 2007 U.S. Dist. LEXIS 69589, at *30 (N.D. Ill. Sept. 20, 2007).  Because Mendys exercised control over the business and was directly responsible for the Company's failure to pay overtime, he is personally liable for its violation of the FLSA.

**C.  Count III:**  retaliatory discharge in violation of the Fair Labor Standards Act, 29

U.S.C. § 215(a)(3) (Count III)

Plaintiff's third claim alleges that he was discharged in retaliation for complaining about

not receiving his wages, a protected activity under 29 U.S.C. § 215(a)(3).  Plaintiff admits that

his complaints were expressed verbally to Mendys and Szwab.  The Seventh Circuit recently

held that internal complaints must be in writing in order to constitute protected activity under §

215(a)(3).  *See Kasten v. Saint-Gobain Performance Plastics,* 570 F.3d 834, 839-40 (7th Cir.

2009) ("[T]he FLSA's use of the phrase "file any complaint" requires a plaintiff employee to

submit some sort of writing").  Because none of Plaintiff's complaints were in writing, they were

not protected under the FLSA.  Count III is therefore decided in Defendants' favor.

**D.  Count IV:** failure to pay overtime wages in violation of the Illinois Minimum

Wage Law ("IMWL"), § 820 ILCS 105/4a(1)

Under the IMWL, an employer must pay an employee who works more than 40 hours a

week at a rate one and a half times the employee's regular rate for hours worked after the fortieth

hour.  820 ILCS § 105/4(a)(1).  The "regular rate" is an hourly rate commanded by the

employee.  56 Ill. Adm. Code § 210.420(b).  "If [an] employee's regular rate of pay is higher

than the statutory minimum, his overtime compensation must be compensated at a rate not less

than one and one-half times such higher rate."  *Id.* at § 210.420(a).

Defendants' disputed that Plaintiff was an employee under the IMWL in their answer,

instead maintaining that he was an independent contractor.  Under the Illinois administrative

code, the following factors are significant in determining whether an individual is an employee

or an independent contractor:

1) the degree of control the alleged employed exercised over the individual;

2) the extent to which the services rendered by the individual are an integral part of the alleged employer's business

3) the extent of the relative investments of the individual and alleged employer;

4) the degree to which the individual's opportunity for profit and loss is determined by the alleged employer;

5) the permanency of the relationship;

6) the skill required in the claimed independent operation

56 Ill. Adm. Code § 210.110.  Therefore, the inquiry under the IMWL parallels the one undertaken under the FLSA.  For the reasons stated earlier, Plaintiff was an employee and not an independent contractor, and Defendants' argument fails.  Because Defendants do not dispute that they failed to pay Plaintiff overtime premiums throughout the entire period of his employment, their conduct violated the IMWL.

The statute of limitations for IMWL claims is three years.  820 ILCS § 105/12(a); *Molina v. First Line Solutions LLC,* 566 F. Supp. 2d 770, 783 n.14 (N.D. Ill. 2007).  As already stated, the parties stipulated both to the number of hours over forty that Plaintiff worked during the actionable period of his employment, and to his rates of pay.  Defendants therefore owe Plaintiff $28,846.25 in overtime wages.

Finally, Mendys was an employer under the IMWL and is personally liable for the damages resulting from its violation.  Under the IMWL, an individual with sufficient control

over a business and a particular set of IMWL violations is personally liable as an employer for those violations. *Morgan v. Speak Easy, LLC,* No. 05-C-5795, 2007 U.S. Dist. LEXIS 69589, at *30 (N.D. Ill. Sept. 20, 2007).  As stated earlier, Mendys had control over the business and was responsible for Great Masonry's failure to pay overtime premiums.  He is therefore liable under the IMWL.

**E. Count VII:** failure to identify and classify Plaintiff as an employee in violation of the Illinois Employee Classification Act, § 820 ILCS 185/20

An employer violates the IECA by failing to designate as an employee an individual who meets the definition of employee under 820 ILCS § 185/10.  820 ILCS § 185/20.  The IECA only applies to individuals performing services on or after January 1, 2008.  820 ILCS § 185/999.  Therefore, the only period of Plaintiff's employment that is actionable under the IECA is January 1, 2008 until January 10, 2008, when he was terminated.  Plaintiff only seeks recovery against Defendant Great Masonry on Count VII because the IECA does not appear to provide for personal liability.

Under the IECA, an "individual performing services for a contractor is deemed to be an employee of the employer except as provided in [820 ILCS § 185/10(b)] and [820 ILCS § 185/10(c)]."  820 ILCS § 185/10(a).  A "contractor" under the IECA is "any sole proprietor, partnership, firm, corporation, limited liability company, association, or other legal entity permitted by law to do business within the State of Illinois who engages in construction as defined in" the IECA.  820 ILCS § 185/5.  Under the IECA, Defendant Great Masonry is considered a contractor.  Plaintiff was therefore an employee of Defendant unless he fell within the exceptions provided under 820 ILCS §§ 185/10(b) and 185/10(c).  Defendant does not argue

that Plaintiff fell within those exceptions, but even it did so, neither exception applies.  Both §

185/10(b) and 185/10(c) are intended to capture situations in which the employee was free from

the control of the employer.  As already stated, Plaintiff was under the full control of the

Company during his employment.  Consequently, Plaintiff's misclassification as an independent

contractor from January 1, 2008 until January 10, 2008 violated the IECA.

Finally, the statute of limitations for an action under the IECA is three years from "the

final date of performing services to the employer or entity."  *Id.* at § 185/60(b).  Because

Plaintiff's final date of employment was January 10, 2008, his claim falls within the statute of

limitations.

## III.    Damages

The FLSA provides that an employer who fails to pay the required overtime premium is

liable to the employee for the unpaid compensation plus an equal amount as liquidated damages,

though liquidated damages are inappropriate if the employer can prove it acted in good faith and

had reasonable grounds to believe that the failure to pay overtime was lawful.  The IMWL

provides that the employer is liable for the unpaid wages and for an additional payment of 2% of

the unpaid wages per month for each month until the wages are paid.  Both statutes allow for

recovery of legal fees and costs.  As stated earlier, Plaintiff is entitled to a payment of

$28,846.25 in unpaid overtime premiums.  Under the FLSA, he is entitled to an additional

$28,846.25 in liquidated damages, as Defendants have not shown that they acted in good faith.

Under the IMWL, he is further entitled to a payment of $21,210.15.  Furthermore, he is entitled

to legal fees and costs.

The IECA provides that "a person aggrieved by a violation" has a private right of action and may recover "compensatory damages and an amount up to $500.00 for each violation," along with legal fees and costs. 820 ILCS § 185/60. Plaintiff seeks to recover $500 for each week of employment during which he was misclassified, for a total of $1000. Although the IECA is unclear as to whether violations should be calculated on a weekly basis, this Court will grant Plaintiff's request based on its reasonability and Defendant's lack of response.

Finally, Mendys and Great Masonry are jointly and severally liable for the violations under the FLSA and the IMWL because they are both considered employees for purposes of those statutes. But because Plaintiff only seeks to recover against Defendant Great Masonry on his IECA claim, Defendant Mendys bears no liability on Count VII.

## IV.   Conclusion

For the foregoing reasons, the Court finds in favor of Plaintiff and against Defendants Great Masonry and Krzysztof Mendys on Counts I and IV. The Court finds in favor of Plaintiff and against Defendant Great Masonry on Count VII. The Court finds in favor of Defendants and against Plaintiff on Count III. Judgment is entered in favor of Plaintiff and against Defendants Great Masonry and Krzysztof Mendys, jointly and severally, in the amount of $78,902.65, plus legal fees and costs. Judgment is entered in favor of Plaintiff and against Defendant Great Masonry alone in the additional amount of $1000.00.

Enter:

/s/ David H. Coar

_____

David H. Coar
United States District Judge

Dated: **September 22, 2009**